Argued June 15; affirmed July 31, 1934

STATE ex rel. CAWRSE et al. v. AMERICAN
SURETY CO. et al.

(35 P. (2d) 487)

*Edward J. Clark,* of Portland (Plowden Stott, of Portland, on the brief), for appellant.

*John H. Carson,* of Salem (C. E. Ross, of Salem, on the brief), for respondents.

*C. F. Gillette,* of Monmouth, for defendant Fischer Warehouse Company.

ROSSMAN, J. The complaint alleges separately four similar causes of action. The first of these avers that the relators, to whom we shall hereafter refer as the plaintiffs, are partners engaged in farming; that the defendant Fischer Warehouse Company is a corporation engaged in the conduct of a licensed public warehouse; that the defendant American Surety Company of New York is engaged in the business of writing surety bonds; and that, October 5, 1926, the warehouse company, as principal, and the surety company, as surety, executed and delivered to the State of Oregon a warehouse bond for the period commencing July 1, 1926, and ending July 1, 1927. The 1923 Session Laws, chapter 78, and Oregon Code 1930, § 61-635, require such bonds of public warehousemen, conditioned upon the latter's "faithful performance of the acts and duties enjoined upon them by law". The pleading further avers that the bond just mentioned was conditioned upon the warehouse company's faithful performance of the duties required of it by our laws; that in August of 1926 the plaintiffs deposited with the warehouse company, as a bailment, 852 bushels of wheat of the market value of $1,227.74; that August 1, 1932, they offered to pay all of the warehouse company's reasonable charges, accompanying their offer with a demand for the return of the wheat; that their

demand was refused; that June 15, 1927, the warehouse company converted to its own use the aforementioned grain; that the plaintiffs have elected to secure redress for the resulting injury by enforcing liability upon the bond; that they filed with the surety company a verified claim and have demanded of both defendants payment of the sum of $1,227.74. The second cause of action is averred in language substantially similar to the first, with the exception that it alleges the execution of a warehouse bond by the same parties on August 3, 1927, for the period of July 1, 1927, to July 1, 1928; the deposit by the plaintiffs with the warehouse company of 3,130 bushels of wheat on August 17, 1927, as a bailment; that the market value of the grain was $4,382.22; that on June 15, 1932, the warehouse company converted the grain to its own use; "that from time to time relator plaintiffs herein have received from Fischer Flouring Mills, a corporation, certain wheat, mill feed and other articles kept by said Fischer Flouring Mills Company for sale, and at the time of so receiving same it was understood and agreed that the reasonable value of the articles so sold by defendant Fischer Flouring Mills to relator plaintiffs should be charged against the amounts owing by Fischer Warehouse Company to relator plaintiffs to said warehouse company as specified in this cause of action; that relator plaintiffs have been unable to secure from defendant Fischer Warehouse Company or from said Fischer Flouring Mills a statement of the amount of such credits; that relator plaintiffs do not know the exact amount of such credits but do know that the amount thereof is less than the sum of $1500; that full information in regard to such credits is in the possession of and available to defendant Fischer Warehouse Company; that on account of such credits relator plain-

tiffs are allowing to defendants on this cause of action, as credit, the sum of $1500''. The third cause of action is substantially similar to the first with the exception that it is predicated upon the warehouse bond signed by the defendants July 1, 1929, extending over the period July 1, 1929, to July 1, 1930. It avers the delivery to the warehouse company by the plaintiffs in August and September of 1929 of 1,060 bushels of wheat as a bailment, of the value of $1,028.56, and the conversion to its own use by the warehouse company of the grain on June 15, 1930. The fourth cause of action is likewise substantially similar to the first. It alleges a warehouse bond signed by the defendants July 1, 1930, for the term July 1, 1930, to July 1, 1931, the plaintiffs' delivery to the warehouse company of 1,826 bushels of wheat October 13, 1930, of the value of $1,059.34, and the warehouse's conversion of the wheat to its own use June 15, 1931. The second, third and fourth causes of action aver that upon the receipt of the wheat the warehouse company delivered to the plaintiffs warehouse receipts requiring it to return the wheat upon demand ''to the order of said Course Bros.''.

The cross-complaint of the defendant surety company, which is denominated an ''equitable answer'', alleges that the Fischer Warehouse Company and Fischer Flouring Mills Company are corporations ''closely related in management''; that the one operated a warehouse and the other a flouring mill; that the four bonds mentioned in the complaint were executed as alleged in that pleading; that an agreement existed between the plaintiffs, the warehouse company and the flouring mills company whereby the plaintiffs delivered their grain to the warehouse company, subject to an agreement which authorized it to sell the grain for their account and deduct from the proceeds

the price of any merchandise sold to the plaintiffs by the flouring mills company; that "pursuant to said understanding numerous transactions occurred during said time between plaintiffs and said Fischer Warehouse Company and Fischer Flouring Mills Company, being the same transactions, among others, referred to by the plaintiffs in their said four several pretended causes of action. The said account involved in said four several pretended causes of action, being the transactions aforesaid, is complicated, complex and long, consisting of many entries of mutual charges and credit and requiring a detailed account of the books of each of said three parties to said interwoven transactions. No settlement of said transactions, or striking of a balance therefrom, has ever been had between said parties and the amount of said balance is unknown and disputed. Each of the three parties has in their or its own possession its own books touching said numerous transactions and discovery is necessary. This answering defendant, as such surety, is liable only for such grain, if any, as the evidence may show was received and was thereafter held by Fischer Warehouse Company as a public warehouseman, under and pursuant to Title LXI, Chapter VI, Oregon Code 1930, which has not been sold and/or accounted for, and/or paid for, and for which due demand with due tender of payment of all proper warehouse and cleaning charges has been made. The determination of these issues involves a complete audit of the books of each of said three parties, and the examination of long, complicated and complex mutual accounts of each of said parties involving numerous transactions, and requires the marshaling of any credits held by Fischer Flouring Mills and/or Fischer Warehouse Company to the exoneration of any liability of this answering defend-

ant, on account of such grain, if any, as the evidence may show, its bond is liable for. This answering defendant is ready, willing and able to pay under the decree of this court such amount, if any, for which its bond is legally liable''. The concluding paragraph of the cross-complaint referring to the three warehouse receipts mentioned in the complaint avers: ''Said warehouse receipts in some instances are known to recite grain not actually received by Fischer Warehouse Company at or during the bond year of their issuance, and in all instances to have been either wholly or substantially discharged by payment, or by receiving credit for wheat, mill feed and other articles kept by said Fischer Flouring Mills Company for sale, and to have been subordinated and/or superseded by said selling agreement and transactions above alleged. On information and belief this answering defendant alleges all of said receipts to be wholly invalid. * * * Plaintiffs threaten to, and unless the said warehouse receipts are impounded and cancelled in equity, will offer said receipts in evidence upon the trial of said law action, as valid and outstanding obligations of Fischer Warehouse Company.'' The pleading concludes with a prayer for (a) an order making the Fischer Flouring Mills Company a defendant; (b) for an accounting between the plaintiffs, the warehouse company and the flouring mills company; (c) for cancellation of the warehouse receipts; and (d) for an injunction restraining the plaintiffs from the further prosecution of their causes of action.

The demurrer to this pleading challenges the right of the surety company to equitable relief.

In support of its contention that the circuit court erred when it entered the order sustaining the demurrer, the surety company argues that equity should

have assumed jurisdiction to (1) cancel the warehouse receipts, and (2) grant an accounting of what the surety describes as "long, difficult, complicated mutual accounts, involving also the books of a third party, Fischer Flouring Mills Company".

It will be observed that not the author of the warehouse receipts but the surety company is the one which seeks their cancellation, and that it seeks cancellation because plaintiffs "will offer said receipts in evidence upon the trial". We remind ourselves that this cross-complaint is filed in the very action wherein the plaintiffs propose to use the receipts. A decree for the cancellation of an instrument is not granted as of course but as a result of the favorable exercise by a court of equity of its discretion: Black on Rescission and Cancellation (2d Ed.), § 644. A majority of the jurisdictions hold that if the instrument under attack does not cast a cloud upon the title to land, nor is of such a character that its transfer to a bona fide purchaser will deprive the party obligatory of his defense to it, equity, in the absence of special circumstances, will not assume jurisdiction of a suit instituted for the cancellation of the instrument, provided the author can avail himself of his defense in an action brought upon the instrument: Pomeroy's Equity Jurisprudence (4th Ed.), § 2107, and Black on Rescission and Cancellation (2d Ed.), § 645; *Cripe v. Wade,* 123 Or. 111 (261 P. 72). This is especially true when action has already been instituted upon the instrument for its enforcement. See 9 C. J., Cancellation of Instruments, § 12, from which we quote:

"The general rule denying equitable relief, where there is a remedy at law by way of action or defense, is held to be especially applicable where an action at law on the instrument sought to be canceled is actually

pending, for then there is ordinarily no danger of loss of testimony through delay, and by interposing the defense to the action the party seeking equitable relief can have protection as adequate and complete as that which can be afforded in equity. In many instances also the denial of relief is proper for the additional reason that the matters at issue can be more conveniently and effectively determined by a jury than by the chancellor.''

In *Grand Chute v. Winegar,* 15 Wall. 373 (21 L. Ed. 174), the federal supreme court affirmed a decree dismissing a cross-bill which had been filed to cancel some negotiable municipal bonds, it appearing that an action was pending upon the bonds before the institution of the equity suit, and that in that action ''the defense to the suit at law upon the bonds is adequate and complete''. In *Sunset Telephone & Telegraph Co. v. Williams,* 162 Fed. 301 (22 L. R. A. (N. S.) 374), the circuit court of appeals for this district, in dismissing a cross-bill for the cancellation of an instrument instituted after an action had been commenced for the enforcement of the instrument, expressed itself thus:

''The cancellation of written instruments is one of the recognized grounds of equitable jurisdiction which does not depend upon the inadequacy of the legal remedy, but courts of equity will in general refuse to exercise the jurisdiction when the legal remedy by action or defense is plain, adequate, and complete. Insurance Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501; Grand Chute v. Winegar, 15 Wall. 373, 21 L. Ed. 174. Thus the jurisdiction will be sustained in cases where the instrument has been obtained by fraud, and is a cloud upon title, or where the instrument is negotiable and the putting it into circulation would be a fraudulent act, or where there is danger of loss of evidence which constitutes the defense if the adverse party delays his action. But the jurisdiction will not be exercised in a suit to cancel a non-negotiable instrument

to which defense may be made in an action at law thereon, unless particular facts are alleged which show that such a defense will be inadequate. The decided weight of authority is that the mere ordinary danger of losing evidence to establish the defense, even where no action at law has as yet been brought upon the instrument, is not of itself sufficient to sustain the jurisdiction. In the present case we have the admission of both the parties to the suit that an action is now pending, in which an immediate determination of the question in controversy may be had.''

Two of our recent decisions illustrate the reluctance of equity to assume jurisdiction after an action has been commenced upon the instrument. In *Portland Iron Works v. Siemens,* 135 Or. 219 (295 P. 463), and *Cripe v. Wade,* supra, we held that the defendants in the law actions then pending were not entitled to maintain cross-complaints for the cancellation of the instruments. We found that they could adequately present their defense to the instruments in the law action. The rule under consideration is a general, not a universal, one. A defendant who seeks the maintenance of a cross-complaint for the cancellation of an instrument must aver special circumstances to exempt him from the application of the rule: *Dixon v. Simpson,* 130 Or. 211 (279 P. 939). The surety company alleges none. We have not overlooked the fact that our laws (Oregon Code 1930, § 71-204) render a warehouse receipt containing the provision above quoted negotiable: *Bank of California National Ass'n v. Schmaltz,* 139 Or. 163 (9 P. (2d) 112). But it will be recalled that the appellant does not expressly seek cancellation because of that circumstance. We notice that the commissioners' note to section 38 of the Uniform Warehouse Receipts Act, being section 71-237, Oregon Code 1930, which prescribes the manner of negotiation,

states: "This section applies the law of bills and notes, as it is in fact applied by mercantile custom, to warehouse receipts." Section 57-403, Oregon Code 1930, being a part of our Negotiable Instruments Act, provides:

"Where an instrument payable on demand is negotiated an unreasonable length of time after its issue, the holder is not deemed a holder in due course."

Section 57-1101, being also a part of our Negotiable Instruments Act, provides:

"In determining what is a 'reasonable time' or an 'unreasonable time' regard is to be had to the nature of the instrument, the usage or trade or business, if any, with respect to such instruments and the facts of the particular case."

It will be recalled that the first cause of action mentions the issuance of no warehouse receipt, but that the second, third and fourth causes aver the issuance of receipts in 1927, 1929 and 1930, respectively. Thus the most recent of these receipts was issued virtually three years before the cross-complaint was filed (1933). We know of no decision holding that one who acquired a demand note three years after its issuance was a holder in due course; see the annotations accompanying section 53 of Brannan's Negotiable Instrument Law (5th Ed.). We believe that it is not customary for farmers to store their grain in public warehouses for three years, and, in the absence of explanation, feel justified in assuming that a warehouse receipt virtually three years old has passed the period in which its negotiation can make its recipient a holder in due course. This conclusion, we believe, is fortified by the circumstance that the cross-complaint does not describe the receipts as negotiable nor seek relief upon the supposition that they were negotiable.

For the reasons above stated, we conclude that the prayer for cancellation did not confer upon a court of equity jurisdiction of the cause.

■■■ Finally, the appellant contends that the averments of its cross-complaint show the necessity for the examination of long, complicated accounts existing between three business units—the farming partnership, the warehouse company and the flouring mills company, and that, therefore, the court of equity should not have dismissed its alleged equitable defense. Reverting to the cross-complaint, we notice that the appellant, in setting forth its version of the receipt by the warehouse company of the grain, alleges that "an agreement and understanding existed between plaintiffs and defendant Fischer Warehouse Company and said Fischer Flouring Mills Company whereby plaintiffs delivered most if not all of their grain to Fischer Warehouse Company with directions to Fischer Warehouse Company to sell said grain for the account of plaintiffs". Other portions of the answer deny the averments of the complaint which allege that the warehouse company received the grain as a bailment. If the answer expresses the truth, the warehouse company did not receive the grain in its capacity as a warehouseman but as a factor. And if it received the wheat as a factor, proof of that fact will entirely defeat this action which is based upon a warehouseman's bond. If the proof establishes the relationship which the appellant submits existed between the parties, there can exist no occasion whatever for an accounting. But if we may be justified in assuming that the appellant intended the above-quoted language to mean that the warehouse company received the grain as a bailment, accompanied with authority to sell it for the account of the plaintiffs, it becomes

necessary to determine whether the latter is an undertaking within the scope of a warehouseman's duties. The above-quoted language is immediately followed with:

"And whereby Fischer Flouring Mills Company was to sell and deliver and did sell and deliver to plaintiff on account of and as a credit upon the selling price of said grain certain wheat, mill feed and other articles."

Thus, it is apparent that the accounts which the appellant describes as long and complicated arose by reason of (1) plaintiffs' delivery to the warehouse company of grain; (2) the latter's sales of the grain; (3) the warehouse company's credit upon its indebtedness to the plaintiffs of money due from them to the flouring mills company. But the bonds upon which this action has been instituted are predicated upon the warehouse company's faithful performance of its duties as a warehouseman. No contention can be made that a custom exists which enlarges warehouse companies' duties since the cross-complaint alleges: "This answering defendant, as such surety, is liable only for such grain, if any, as the evidence may show was received and was, therefore, held by Fischer Warehouse Company as a public warehouseman under and pursuant to Title LXI, Chapter VI, Oregon Code 1930." Section 61-601, Oregon Code 1930, being a part of the laws just mentioned, defines a public warehouse thus:

"* * * includes any elevator, mill, warehouse or structure in which grain or hay is received from the public for storage, shipment or handling, whenever such grain or hay is carried or intended to be carried to or from such warehouse, elevator, mill or structure by a common carrier."

Section 71-257, Oregon Code 1930, being section 53 of the Uniform Warehouse Receipts Act, defines the word "warehouseman" thus:

"'Warehouseman' means a person lawfully engaged in the business of storing goods for profit, and includes every person keeping, controlling, managing or operating as owner or agent or superintendent of any company or corporation, any warehouse, commission house, forwarding house, mill, wharf or other place where grain, flour, pork, beef, wool or other produce or commodity is stored."

67 C. J., Warehousemen and Safe Depositaries, § 1, p. 441, defines warehouseman thus:

"A warehouseman is one engaged in the business of receiving and storing goods of others for compensation or profit; 'a person who receives goods and merchandise to be stored in his warehouse for hire'. 'One who, as a business and for hire, keeps and stores the goods of others'."

In *Savage v. Salem Mills Co.*, 48 Or. 1 (85 P. 69, 10 Ann. Cas. 1065), and *State v. Stockman*, 30 Or. 36 (46 P. 851), we held that bailments did not arise when grain was delivered to warehousemen under agreements that authorized them to use the grain and discharge their obligation to the depositors by paying for it, or, in the event that the warehouseman neither used nor sold it, to deliver, upon demand of the depositors, a like amount of grain.

Thus, a warehouseman is a person who receives grain for the purpose of its storage and return. He is not a factor nor a sales agent. Such being true, we are satisfied that, if the warehouse company sold grain belonging to the plaintiffs and collected the prices obtained, these services were not performed by it in its capacity as a warehouseman. Therefore, there exists no occasion in this action for taking an account-

ing of those transactions. Briefly summarized, the only issues for determination in this action are the amount of grain which the warehouse company received as a warehouseman, its alleged conversion of the grain and the credits to which the warehouse company is entitled by reason of the plaintiffs' indebtedness to the flouring mills company. No contention has been made that in the review of these transactions any accounts will be encountered which are complicated nor beyond the capacity of a court of law to expeditiously handle. The cross-complaint mentions the necessity of a discovery, but the importance of this averment is lessened by the disposition which we have just made of the foregoing contention. Moreover, § 7-203, Oregon Code 1930, provides:

"The court or judge thereof, while an action or suit is pending, may order either party to give the other, within a specified time, an inspection and copy or permission to take a copy of any book, document, or paper in his possession, or under his control, containing evidence or matters relating to the merits of the action or suit, or the defense therein. If obedience to * * *"

We know of no reason why the documents mentioned in the cross-complaint cannot be adequately examined in the law action without necessity for a discovery as granted in courts of chancery. For the reasons above stated, we conclude that the circuit court did not err when it held that the appellant was not entitled to an accounting.

The above disposes of every contention advanced by the appellant. Authorities cited by it and not mentioned herein have not escaped our attention. Since we have resolved these contentions adversely to the appellant, it follows that the orders and decree of the circuit court are affirmed.

CAMPBELL, BELT and BAILEY, JJ., concur.