**MERCHANTS MUTUAL BONDING COMPANY, Appellee,**

v.

**APPALACHIAN INSURANCE COMPANY, Appellant.**

**No. 76–1334.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1977.

Decided June 16, 1977.

Thomas S. Reavely, Des Moines, Iowa, for appellant; Timothy J. Walker, Des Moines, Iowa and Richard L. Bodet, New Orleans, La., on the brief.

Harry T. Watts and F. Richard Lyford, Des Moines, Iowa, for appellant.

Before LAY, ROSS and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

This is an action in the nature of interpleader brought by appellee Merchants Mutual Bonding Company, the surety on the statutory warehouseman's bond of a bankrupt Iowa grain elevator. The Commodity Credit Corporation (C.C.C.) had dealings in grain with the elevator; this appeal involves a claim on the bond by the C.C.C.'s insurer, appellant Appalachian Insurance Company. The District Court[1] denied the claim, finding that the loss involved was not within the coverage of the warehouseman's bond.

## I.

The C.C.C. became involved here through its program of producer loans. By terms of these loans, the C.C.C. advances funds to farmers, who use the funds to raise crops. A participating farmer can either sell the resulting grain, repaying the loan and keeping any profit, or transfer all rights in the grain to the C.C.C. in full satisfaction of his loan.

The farmers in this case, participants in the producer loan program, harvested their crops in the fall of 1971 and deposited the grain with the Fairfield Elevator Company, a warehouse for agricultural products licensed under Iowa Code Chapter 543. The elevator issued warehouse receipts, which were deposited with the C.C.C. as security for the producer loans. In March, 1972, the farmers determined to sell their grain to the elevator. The C.C.C. delivered the warehouse receipts to the elevator. For each of the seventeen receipts, the elevator issued two checks: one was payable to the C.C.C. for the amount of the producer's loan, and one was payable to the farmer for the excess of the purchase price over the loan amount. The checks issued to the farmers cleared the elevator's bank; the checks issued to the C.C.C., totaling $39,453.17, were dishonored for insufficient funds.

On April 21, 1972, the elevator filed a voluntary petition in bankruptcy. Grain in the elevator was sold under order of the bankruptcy judge, and the proceeds were held by the trustee. The C.C.C. filed a petition in reclamation to recover the proceeds to the extent of $58,602.47, the value of the grain represented by the seventeen receipts, and $255,711.31, the value of certain other unquestionably valid warehouse receipts that it still held, representing grain which farmers had transferred to the C.C.C. in full satisfaction of their producer loans.

The bankruptcy judge held the seventeen warehouse receipts for which checks had been dishonored to be invalid, and denied secured status as to them. He allowed the

---

1. The Honorable William C. Hanson, United States District Court for the District of Iowa.

claim based on the unquestionably valid receipts and ordered distribution of the proceeds of the sale of grain represented by the receipts. The proceeds produced a deficiency of $9,163.32, which was treated as an unsecured claim.

The bankruptcy judge also awarded Appalachian, which was by then subrogated to the rights of the C.C.C.,[2] $42,019.40 from the bankrupt's estate, as an unsecured creditor, for claims which included the $9,163.32 deficiency and the dishonored checks.

The seventeen receipts, meanwhile, had been canceled by the elevator. They were forwarded to the Iowa Commerce Commission and canceled by the Commission. The Commission learned that the checks had been dishonored, and returned the receipts to the elevator bearing the notation "Good improperly canceled."

Merchants Mutual then filed this suit, seeking to resolve all claims on the elevator's warehouseman's bond. Appalachian sought recovery on the bond. It claimed that it was entitled to the value of an amount of grain represented by the seventeen warehouse receipts, or at least to the amount of the dishonored checks. The District Court, in a carefully considered memorandum opinion, denied relief. The Court found that, "The unpaid balance of Appalachian's claim * * * is not an obligation of Merchants as a surety on the elevator's statutory warehouse bond." That holding is the principal issue before us on appeal.

## II.

A "warehouseman" was defined by Iowa law at the time this case arose as "a person who uses or undertakes to use a warehouse for the storage of agricultural products for compensation." Iowa Code Annot. § 543.-1(8) (1950).[3] Subject to certain exceptions not relevant here, only a warehouseman

licensed by the state can accept bulk grain for storage. Iowa Code Annot. § 543.16 (1950). As a prerequisite to obtaining a license, a warehouseman must procure a bond

> to secure the faithful performance of his obligations as a warehouseman under the terms of this chapter and the rules and regulations prescribed hereunder, and of such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agricultural products in such warehouse.

Iowa Code Annot. § 543.12 (1950). The bankrupt elevator obtained a bond from appellee, Merchants Mutual, which satisfied this requirement.

■ It is clear from the statutory language that not every obligation of one who operates a warehouse is covered by the bond; coverage is limited to "obligations as a warehouseman," *i. e.*, obligations incurred in "the storage of agricultural products for compensation." The obligation involved in this case, however, is the elevator's duty to pay to the C.C.C. a portion of the purchase price of the grain. This duty arose, not from the elevator's storage of the grain for compensation, but from its purchase of the grain for its own account. It has frequently been held, under the Iowa statute and similar statutes of other states, that an obligation of this kind is not within the coverage of the statutory bond because it is not an obligation "as a warehouseman." *See Allied Mutual Ins. Co. v. Farmers National Co.,* 303 F.Supp. 555, 559 (N.D.Iowa 1969); *United States Fidelity & Guaranty Co. v. Long,* 214 F.Supp. 307, 314 (D.Or. 1963); *United States v. Fireman's Fund Ins. Co.,* 191 F.Supp. 317 (D.Idaho 1961); *Jensen v. United States Fidelity & Guaranty Co.,* 78 Idaho 145, 298 P.2d 976, 978 (1956).

---

2. Appalachian had paid the C.C.C. $314,313.31 in settlement of all its losses on all the receipts. The C.C.C. later refunded $1,090.47 of this amount as an "overpayment."

3. By Iowa Acts 1972 (64 G.A.) ch. 1118 §§ 1, 2, the definition of warehouseman was amended to read as follows: "Warehouseman means any person engaged in the business of operating a warehouse for the storing, shipping, handling or processing of agricultural products."

■ The District Court found the rule of these cases to be the law of Iowa. We cannot say that it erred in so doing, particularly in light of the great weight we accord the District Court's determination of questions of state law. *See Smith v. Nick's Catering Service,* 549 F.2d 1194, 1196 (8th Cir. 1977); *Rochholz v. Farrar,* 547 F.2d 63, 66 (8th Cir. 1976).

Appalachian argues that the duty to pay for the grain was an "additional obligation" required to be bonded under section 543.12. The difficulty with this argument is that the statute only requires bonding of additional obligations undertaken "as a warehouseman." The obligations referred to are "additional" only in that they are not prescribed by statute, rule or regulation, but result from agreement between the warehouseman and a depositor of grain. There is nothing in the Iowa statute extending a surety's obligation beyond warehouseman-depositor transactions, to cover transactions of sale.

■ We conclude, as did the District Court, that the duty to pay for the grain represented by the seventeen receipts was not an "obligation as a warehouseman" and thus was not within the coverage of the bond.[4]

### III.

■ Appalachian contends that, even if it can have no recovery against Merchants Mutual for the seventeen transactions, there remains a $9,163.32 debt owing to it as a result of transactions which unquestionably are covered by the bond. This amount is the difference between the value,

on the date of demand for delivery, of the grain represented by other unquestionably valid warehouse receipts which the C.C.C. held prior to the bankruptcy, and the proceeds of a like quantity of grain which was sold by the trustee in bankruptcy.

The trustee distributed $42,109.40 to Appalachian as an unsecured creditor; the District Court held in effect that this fully satisfied the liability of the bankrupt elevator for the valid receipts, so that Appalachian has no claims against Merchants Mutual's bond. Appellant contends that the District Court erred in applying this $42,109.40 first against that portion of the elevator's obligation which was covered by the bond; appellant contends the distribution should first have been applied to the obligation not covered by the bond. Appellee contends that the District Court's ruling was correct or, alternatively, that the distribution should have been prorated between the covered and uncovered obligations. We adopt the latter view.

"Neither the debtor, nor the creditor can affect the application of payments not voluntarily made, such as one enforced by judicial proceedings." Restatement of Contracts § 393 (1938). As shown by Illustration 1 to § 393[5] of the Restatement, the appropriate course here was to apply the distribution ratably to the two classes of debts.

If this had been done, $7,920.66 of the bankruptcy distribution would have been applied to the $9,163.32 still due on valid warehouse receipts, for which Merchants Mutual is liable under the bond.[6] The dif-

---

4. The two cases principally relied on by Appalachian are inapposite. In *Stevens v. Farmers Elevator Mutual Ins. Co.,* 197 Kan. 74, 415 P.2d 236 (1966), the elevator's obligation plainly arose from the storage, rather than the purchase of grain. In *Pohl v. Jackson,* 179 Minn. 398, 229 N.W. 555 (1930), the Court found that dishonor resulted from negligence in the tardy presentation of the payment check; it did not address the question whether, had the check been timely presented, the surety would have been liable on its bond.

Since we conclude that the bond in this case does not extend to the seventeen grain sale transactions, we do not reach the question

whether Appalachian would be entitled to the value of the grain represented by the warehouse receipts, rather than the total amount of the dishonored checks, if the bond were applicable.

5. "A owes B several debts, one of which is secured by collateral belonging to a third person. A becomes insolvent and a receiver is appointed. The receiver makes a payment. It will be applied ratably to the several debts."

6. The elevator's unsatisfied obligations to the C.C.C. consisted of the amount due on the canceled checks ($39,453.17), which was not

ference, $1,242.66, remains due and must be paid by Merchants Mutual.

The judgment of the District Court is vacated and the cause remanded with instructions to enter judgment in favor of appellant in the amount of $1,242.66. The opinion of the District Court is in all other respects affirmed.

covered by the bond, and the amount due on the valid warehouse receipts ($9,163.32), which was covered by the bond. The total of these obligations was $48,616.49; the $9,163.32 due on the warehouse receipts was 18.85 percent of this total. Apportioning the $42,019.40 bankruptcy distribution ratably between the two classes of debts, 18.85 percent, or $7,920.66, is deemed to have been paid on the obligation represented by the valid warehouse receipts.